## HOE and another *v.* KAHLER.[*]

*(Circuit Court, S. D. New York. March 27, 1882.)*

1. **PATENTS FOR INVENTIONS — IMPROVEMENT IN PRINTING PRESSES — CONSTRUCTION OF.**

The third claim of letters patent No. 131,217, granted Richard M. Hoe and Stephen D. Tucker, September 10, 1872, for "separating two following sheets of paper, in their travel to the fly frame, into two different paths, by an arrangement of tapes and switches, and making the travel of one sheet suitably longer than the other, so that when they meet again they will issue one upon the other to the fly," *held* to be valid, and construed to cover an arrangement of tapes and switches which attains such result either by the divergence of such sheets into two paths, each different from the original line of travel, by means of double-acting switches, or by the continuing of one sheet in its original path and the diverting of the other into a separate path by single-acting switches.

2. **SAME — OATH TO CAVEAT — JOINT INVENTION — ADVICE OF COUNSEL.**

The filing of a *caveat*, with an affidavit by a single individual that he believes himself to be the first original inventor, does not preclude the subsequent procurement of a patent for the improvement described in the *caveat* as the joint invention of himself and another, where such original affidavit was made under advice of counsel and a miscomprehension of the facts.

In Equity. Final hearing.

*M. B. Philipp* and *B. F. Thurston*, for plaintiffs.

*B. F. Lee* and *W. D. Shipman*, for defendant.

BLATCHFORD, C. J. This suit is brought on letters patent No. 131,-217, granted to Richard M. Hoe and Stephen D. Tucker, September 10, 1872, for an "improvement in printing presses." Infringement is alleged of only claims 3 and 4 of the six claims, and only those parts of the specification need be referred to which concern claims 3 and 4. The specification says that the invention "relates to printing machines, and more particularly to that class commonly known as perfecting presses, in which the sheets of paper are printed on both sides in passing once through the machine. It consists in certain

[*]Reported by S. Nelson White, Esq., of the New York bar

novel· combinations and arrangements of parts to be more fully de-
scribed hereafter, which have for their object the more perfect opera-
tion of the machine in presenting the sheets of paper to the printing
mechanism and conducting them away after being printed." There
are six figures of drawings, of which only figures 4 and 5 are impor-
tant to the present suit. The specification says: "The sheets of paper
to be printed are carried to and away from the printing mechanism
by the series of tapes, *a, b, c, d, e, f, g, h, i*, shown in detail in figures
4 and 5." Then the printing mechanism is described, which prints
both sides of each sheet, and the means of conveying the sheets to
and through such mechanism. Then the text proceeds:

"The sheets, after leaving the printing mechanism, are carried between the
tapes, *e, f*, up to the rollers, 61, 62, where, by an arrangement of tapes and
switches, they are alternately directed into different paths. The tapes, *g*, and
*h*, run in contact with the tapes, *e, f*, after they diverge at the rollers, 61, 62,
and they act to carry the sheets forward after they leave the tapes, *e, f*. The
tapes, *g*, pass around the roller, 63, horizontally, a short distance in contact with
the tapes, *f*, and thence around the roller, 69, to the roller, 63, again; and the
other series, *h*, pass from the roller, 60, upward and in contact with the tapes,
*e*, to and over the roller, 59, beneath the tapes, *e*; thence horizontally to the
roller, 58; and thence to and around the roller, 70; and, finally, in a horizontal
direction to the roller, 63, and over it to the roller, 60. These tapes convey
the printed sheets to the flying mechanism as they are directed by the switches,
72. The printed sheets, as they leave the tapes, are received by two separate
fly-frames, R, S, and laid by them upon two separate tables, P, Q; and, through
the arrangement of the tapes before described, and the operation of the
switches, 71, 72, two sheets are presented at the same time, one upon the other,
and taken by the fly. The switches, 72, act to direct the sheets into different
paths, and the switches, 71, act to direct their passage to the fly-frames. As
the sheets are fed in one after the other from the tables, T, U, V, W, it is neces-
sary to make some take a longer path than the others in order to have two of
them issue together at the same time from the tapes to be taken by the fly-
frames, and for this purpose the switches, 72, are employed and operated as
follows. * * *"

Then follows a description of means for operating the switches, 72,
and of means for operating switches, 71, and the fly-frames, R, S; the
fly-frames being alternately raised and lowered, one being up while
the other is down. The text then goes on:

"In conducting the sheets from the last printing cylinder to the flying
mechanism between the tapes, they follow one immediately behind the other
as they are fed from the tables, and it is necessary, as before stated, to make
the first and third sheets travel a longer path than the second and fourth, in
order to cause two sheets to issue simultaneously and lie one upon the other
when taken by the fly-frame. As the first sheet, therefore, approaches the
rollers, 61, 62, the switch, 72, is turned into the position shown in figure 4, so·

that the sheet, in its travel upward, strikes against the curved edge of the switches, 72, is directed by them between the rollers, 60, 61, and the tapes, *e, h,* and thus caused to travel between these tapes over the rollers, 59, 58, while, as the edge of the second sheet approaches the rollers, 61, 62, the switch is turned back into the position shown in figure 5, so that the sheet will be directed by it between the rollers, 62, 63, and caused to enter between the tapes, *f, g,* and be carried by them in a shorter path to the point where they issue to the fly. The third and fourth sheets are acted upon by the switches, 72, in the same manner, and one caused to take a longer path than the other, and so on for the following sheets. Two printed sheets are thus brought out on the fly-frame by being separated in their courses after they leave the printing mechanism into two different paths, and being brought together again, so that when they meet they will issue one upon the other. The roller, 59, is held in adjustable bearing, 80, secured to the side-frames, C, and can be raised or lowered to make the path of the first sheet longer or shorter, as it may be necessary. The machine is provided with two separate fly-frames and receiving tables, placed back to back for the purpose of causing the sheets, when thrown upon the tables, to have one side exposed to view on one table and the other side in view on the other table, so that both printed sides are in sight at the same time for inspection. In delivering the double sheets to the fly-frames they are directed alternately to each fly by the switches, 71, which vibrate between the rollers, 57, 68, and issue in front of the fly, S; but, as the edges of the next two sheets approach the switches, 71, they will be turned in the other direction, figure 5, and caused to direct the sheets into the path between the rollers, 66, 67, so that they will issue in front of the fly, R, and be laid upon the table, P."

Claims 3 and 4 are as follows:

"(3) Separating two following sheets of papers, in their travel to the fly-frame, into two different paths, by an arrangement of tapes and switches, and making the travel of one sheet suitably longer than the other, so that, when they meet again, they will issue one upon the other to the fly, substantially in the manner described and specified. (4) The employment and use of the adjusting roller, 59, for regulating the travel of the first sheet, constructed and operating substantially in the manner described and specified."

Claim 3 is for an arrangement of tapes and switches which separates two following sheets of the printed papers, in their travel to the fly-frame, into two different paths, the travel of one of the two sheets in its path being suitably longer than the travel of the other of the two sheets in its path, so that, when the two sheets meet again they will issue one accurately superimposed upon the other to the fly. Each sheet follows the line of travel of its controlling tapes. Sheets 1, 3, 5, and so on, in numerical order, go the longer path, and sheets 2, 4, 6, and so on, in numerical order, go the shorter path, so that sheet 1, starting before sheet 2, may yet arrive at the same time with it, and

the two issue in unison one upon the other, and so with sheets 3 and 4, and sheets 5 and 6. Two sheets are thus delivered at one and the same time to one fly-frame, and then two others are delivered at another and the same time to the other fly-frame.

The defendant's apparatus has no fly-frame. The sheets on it issue in pairs to a folding apparatus. It also has single-acting switches, instead of double-acting switches, at the point where the longer and shorter paths take their departure, and it has no switches, 71. If the fly-delivery devices, and the switches, 71, and the double-acting switches, as distinguished from the single-acting switches, are no part of claim 3, then the infringement is clear. In the defendant's machine the printed sheets are successively carried by the same sets of tapes to a place of divergence, where there are single-acting switches, along the edge of the sheet. When the switches are out of the way the sheet passes on in a path which is a continuation of its path up to the switches. When for the next sheet the switches are interposed, that sheet is diverted into another path. Then the switches move out of the way again and the first operation is repeated, and so on,—the switches moving into the way and out of the way alternately for each alternate sheet. One of the paths is suitably longer than the other, so that, when the two paths meet again, the sheets coincide, and one is upon the other and they issue in pairs. The question of the infringement of claim 3 depends, therefore, mainly upon the proper construction of that claim.

The object of the invention in claim 3, as indicated by the text of the specification, is to carry along the sheets in succession and divide them into two series, each series consisting of all the alternate sheets, and to cause a sheet of one series and the following sheet of the other series to be brought together in pairs, surface to surface with coinciding forward edges, and thus be delivered ready for the next operation that is required. In the plaintiffs' patent a fly takes them. In the defendant's apparatus, they pass on and are mechanically folded, the two sheets at a time. In the plaintiffs' patent the use of the two flies makes necessary the switches, 71, to direct each successive pair of sheets to a different fly. But there is nothing in claim 3 which refers to any operation that is to be performed upon the sheets after any successive two sheets are made thus to coincide and be superimposed. The separation into two paths, the longer and the shorter travel, the meeting, and the issuing one upon the other, are all there is that is made essential either by the description or the claim. It is true that the travel is to the fly-frame, because

there is a fly-frame, and that the fly takes the pair of sheets when they issue, because there is a fly. But the invention of separation, travel in paths of different lengths, and uniting and issuing one upon the other, has no relation to and does not include the fly-frame or the switches, 71, nor does claim 3 include them. The word "switches," in claim 3, cannot be construed to include the switches, 71, without distorting the language of the claim. The switches, 71, take no part in separating two following sheets of papers in their travel to the fly-frame into two different paths, one longer than the other. The switches, 71, act upon the sheets after they have left their different paths and have come together again, one upon the other, and act upon them only as pairs, and have no action to make pairs of them.

A determination as to whether the switches, 72, shall be single-acting or double-acting is controlled entirely by the fact as to whether the original path is to proceed on from where the switches are located in a continuation of the same line, as a path for one of the sheets, leaving the other sheet of the pair to be diverted by the switches into another path, or whether the original path is not to proceed on in the same line; but there are to be two new paths, each controlled by a separate movement of the switches. In the former case the switches keep out of the way to permit the original path to continue on and continue open as one path, and then come into the way to create the second path. In the latter case the switches come into the way to divert one sheet from its original line into one path, and then come into the way to divert the second sheet from its original line into another path. There is no difference in principle between the switching arrangement in the two cases. The change is purely mechanical, depending on the courses the sheets are to take with reference to the path by which they approached. The single-acting switches direct the travel of the sheet out of whose way they keep, relatively to the path of the other sheet, as effectually as they direct the path of the latter relatively to that of the former, by being interposed in the way.

On the twenty-fourth of January, 1854, Mr. Hoe filed in the patent-office a *caveat* which described the invention covered by claim 3, and illustrated it by drawings in a manner sufficiently full and clear to have enabled the apparatus to be built and put in practice. The affidavit to the *caveat* was sworn to by Mr. Hoe February 24, 1854, and was filed in the patent-office February 27, 1854. In that affidavit Mr. Hoe swears that he verily believes himself to be the original and first inventor of the improvement. This *caveat* was re-

newed October 4, 1860; September 18, 1861; October 9, 1862; September 16, 1863; August 22, 1864; October 5, 1865; October 5, 1866; October 3, 1867; October 7, 1868; and October 5, 1869. The patent in suit was applied for April 4, 1872. The evidence of Mr. Hoe and Mr. Tucker is entirely conclusive to show that they were the joint inventors of what is embraced in the patent, and that Mr. Hoe was not the sole inventor. Notwithstanding the affidavit to the *caveat*, the fact of joint invention is clear. Moreover, the evidence shows that the affidavit was true, and that Mr. Hoe did, at the time he made it, believe himself to be the original and first inventor of the improvement. All that Mr. Hoe swears to is his belief. It is shown that he had such belief; that he told Mr. Tucker at the time that he had such belief; that he was advised by counsel that notwithstanding he and Mr. Tucker mutually produced or invented what was in the *caveat*, yet their relations as employer and hired employe made the invention the property of the employer, and authorized the taking of the *caveat* in the name of the employer alone; that he told Mr. Tucker of such advice at the time; and that Mr. Tucker concurred in what was done. With this explanation there is nothing connected with the *caveat* to interfere with the validity of the patent, or to prevent the carrying back of the invention claimed as a joint invention to the date of the original filing of the *caveat*. The *caveat* having been filed as for an invention of Mr. Hoe alone, he could have no motive, nor could there be any advantage, in the joint application for the patent as for a joint invention, except that it was true that the invention was in fact joint, and that the advice he had received before the time the *caveat* was filed had been modified by different advice received, on full consideration of all the facts, when a patent was to be applied for. The impulse of self-interest would naturally be to disregard the truth, and thus avoid any necessity for explaining the apparent discrepancy between the affidavit to the *caveat* and the affidavit to the application for the patent. Both Mr. Hoe and Mr. Tucker testify fully and without reservation, and disclose fully all the facts and all the motives which induced the action taken. There is nothing to impeach their truth or credibility. The question is as to what Mr. Hoe and Mr. Tucker believed at the time. The question is not as to whether the advice of the counsel was correct on the facts presented to him. Exactly what facts were presented to him cannot now be told. The matter was oral. Whether all the facts, as now disclosed, were presented to him, we cannot tell. The evidence shows that the same counsel who gave the advice afterwards, and with

reference to taking out a patent for the joint invention of Mr. Hoe as employer and Mr. Tucker as his employe, advised that there was a question as to the propriety of taking out such patent in the name of the employer alone, and that it was wiser to take it out in their joint names. This goes to confirm the fact that the original advice was given. Mr. Hoe, as a layman, had a right to act upon it, and to swear to his belief. This he did.

In the contents of the file wrapper in the matter of the patent, is an oath, sworn to by Mr. Hoe, March 12, 1872, at London, England, before "J. Nunn, a London commissioner, to administer oaths in common law," the official character of Mr. Nunn being authenticated by a certificate made by the consul general of the United States at London. No other oath by Mr. Hoe to the specification or application appears among the contents of the file wrapper. There is a proper affidavit by Mr. Tucker that he verily believes himself to be the first, original, and joint inventor with Mr. Hoe, and as to the other particulars required. The form of the oath by Mr. Hoe is not criticised, but it is objected that the oath was not taken before a proper officer, and so there was no oath by Mr. Hoe, and no valid patent. The contents of the oath were prescribed by section 30 of the act of July 8, 1870, (16 St. at Large, 202.) That section provided that the oath might be made "before any person within the United States authorized by law to administer oaths, or, when the applicant resides in a foreign country, before any minister, charge d'affaires, consul, or commercial agent holding commission under the government of the United States, or before any notary public of the foreign country in which the applicant may be."

The bill alleges that the plaintiffs obtained letters patent for their invention "in due form of law." It alleges nothing as to any oath or as to any application, except to say that they obtained the patent "upon due application therefor." The answer does not aver any defect in Mr. Hoe's oath, or any want of an oath, but alleges merely that the defendant "is not informed whether, in other respects, the requirements of law relative to the granting of letters patent were complied with by the said Hoe and Tucker, or what, if any, proceedings were had prior to the issue of said letters patent, and therefore denies the allegations of the bill of complaint in respect to the same, and leaves the complainants to make such proof thereof as they may be advised." The plaintiffs sustain whatever *prima facie* burden there was upon them because of the averment as to "due application" by introducing the patent. The plaintiffs did not put in evi-

dence the file wrapper and contents. They were put in evidence by the defendant under the objection by the plaintiffs that they were incompetent, irrelevant, and immaterial. There is no disclosure in the record of any point being made by the defendant as to a defect in Mr. Hoe's oath, or as to the want of an oath by Mr. Hoe. The plaintiffs had put the patent in evidence without any objection being taken by the defendant that it was not properly granted, because there was no proper oath. There is no evidence put in by the defendant to rebut the presumption, from the grant of the patent, that there was a proper prior oath by Mr. Hoe tending to, show that there was no such oath by him, or that the oath appearing was the only oath he made. The copy of the file wrapper and contents is a copy certified January 9, 1881, and speaks only as to what were the contents of the file wrapper on that date. The papers are not evidence to show that there was not a proper oath by Mr. Hoe other than the one referred to, even if that were an improper one. They were not competent or relevant to show the want of an oath. The patent recites that the plaintiffs "have complied with the various requirements of law in such cases made and provided," and, "upon due examination made," they are "adjudged to be justly entitled to a patent under the law." Section 26 of the act of 1870 provides that the inventor must make application in writing to the commissioner of patents for the patent. Section 30 provides for the oath to be made by the applicant. Section 31 provides that "on the filing of any such application, and the payment of the duty required by law, the commissioner shall cause an examination to be made of the alleged new invention or discovery; and if, on such examination, it shall appear that the claimant is justly entitled to a patent under the law, and that the same is sufficiently useful and important, the commissioner shall issue a patent therefor." Assuming that it is open to a defendant, on pleadings such as those in this case, or in any case, to defend a suit on a patent for infringement by setting up and showing a defect in, or a want of, the preliminary affidavit, when a patent is issued containing such recitals as that in this case,—a question not now necessary to be considered or discussed,—it is very clear that the defendant in this case does not show the existence of such defect or want by any competent evidence.

It remains to consider the Campbell machine on the question of novelty as to claim 3. It is clear that Hoe and Tucker made the invention before Campbell did, and clearly described it in the *caveat* and drawings filed in 1854. No press containing the invention of

claim 3 was made before 1871, because a printing press of the kind and capacity shown in the *caveat* is a structure of large cost, not to be made with the chance of a sale, but only to be made on an order, of a particular size, for a particular newspaper. On the twenty-first of April, 1871, an order for the press was received from the *Daily News*. By December, 1871, the machine was built and set up and successfully worked in the factory of Mr. Hoe, embodying claim 3. It was then taken down and was put up in the *Daily News* office, and worked there in February, 1872. Although the Campbell delivery apparatus is alleged to have been constructed early in the fall of 1871, tapes were not applied to it, nor were the switches or the mechanism that operates the switches applied until January or the first of February, 1872, in Ayer's factory at Lowell. The delivery apparatus was not set up, nor were sheets of paper run through it, before that time. Therefore, priority of completion of mechanism, as well as priority of invention, must be determined in favor of the plaintiffs.

Claim 4 is a claim to the adjusting roller for regulating the travel of the first sheet, in its longer path, relatively to the travel of the second sheet, in its shorter path. It thus involves the two several series of tapes of the two several paths. The adjustment of the relative lengths of the two paths to each other, by modifying the length of the longer one, though an adjustment of the roller acting on the longer tapes, is the point of the claim. The defendant's expert says that the English patent to Dryden and Miles does not contain any description of the apparatus relied on; and that the drawing alone is imperfect, and is not a sufficient description to invalidate claim 4. The plaintiffs' expert says that the roller of Dryden and Miles does not act on one set of tapes alone, but varies the lengths of two sets of tapes simultaneously, and to substantially the same extent.

The defendant's expert says that the Dryden press at Gray & Green's exhibited the invention in claim 4, but he gives no reason for so thinking. The plaintiffs' expert says that that press had only one set of tapes, and had no method of adjustment by which the travel of one sheet could be adjusted relatively to the travel of another and following sheet; and that the adjustment of the roller in it adjusted the travel of the same sheet, relatively to forms of types which printed the two sides of it, so as to make the impressions register. This is not the invention of claim 4.

There must be a decree for the plaintiffs as to claims 3 and 4 with costs.